# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**SIERRA R. HILL BYRD,**

             **Plaintiff,**

**v.**                                                     **CIV 04-0370 LAM**

**JO ANNE B. BARNHART,**
**Commissioner, Social Security Administration,**

             **Defendant.**

# <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on *Plaintiff's Motion to Reverse and Remand Administrative Agency Decision* (*Doc. 8*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to having the undersigned United States Magistrate Judge conduct all proceedings and enter final judgment in this case. The Court has reviewed Plaintiff's motion and the memorandum in support of the motion (*Doc. 9*), Defendant's response to the motion (*Doc. 12*), Plaintiff's reply to the response (*Doc. 13*), and relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record (hereinafter "*Record*" or "*R.*"). For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED**, and this case remanded to the Commissioner of Social Security (hereinafter, "Commissioner") for further proceedings consistent with this Memorandum Opinion and Order.

# I.  Procedural History

On January 28, 2003 Plaintiff, Sierra R. Hill Byrd, applied for Supplemental Security Income benefits (*R. at 52.*), with a protected filing date of January 19, 2001[1] *(R. at 22, 51.).*  In connection with her application, she alleged a disability since January 19, 2001.  (*R. at 17 and Plaintiff's Memorandum at 1.*)  In connection with her application, Plaintiff alleged a disability due to degeneration of the spine and severe pain in her lower back and pain and numbness in her right leg. (*R. at 63.*)  There is also some evidence in the *Record* that Plaintiff suffers from, or complains of, renal insufficiency and fibromyalgia[2].  (*R. at 21, 153, 187-191, 392.*)  Plaintiff's application was denied at the initial and reconsideration levels. (*R. at 30-33, 36-39.*)

An administrative law judge (hereinafter "ALJ") conducted a hearing on July 16, 2003.  (*R. at 436-466.*)  Plaintiff was present and testified at the hearing. (*R. at 438-462.*)  Plaintiff was represented by counsel at the hearing.  (*R. at 438.*)  On August 20, 2003, the ALJ issued his partially favorable decision in which he found that Plaintiff was disabled at step five of the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. *(R. at 22.)*  The ALJ found that Plaintiff "has been disabled at all times since March 15, 2003, but not before, and that she is eligible for supplemental security income benefits based on her application for benefits protectively filed

---

[1]The Social Security Administration will use a 'protected filing date' *i.e.*, the date of an oral inquiry about benefits or the date of a written statement, as the filing date of an application for benefits if the use of that date will result in eligibility for additional benefits and if certain criteria are met.  *See* C.F.R. §§ 416.340, 416.345.

[2]Fibromyalgia is a chronic condition causing pain, stiffness, and tenderness of the muscles, tendons, and joints.  Fibromyalgia is also characterized by restless sleep, awakening feeling tired, fatigue, anxiety, and depression.  The painful tissues involved are not accompanied by inflammation, therefore, despite potentially disabling body pain, patients with fibromyalgia do not develop body damage or deformity.  *MedicineNet.com.*

on January 19, 2001."[3]  *(R. at 22.)*  The ALJ also found that "[b]ecause the claimant's condition should improve, it is recommended that a review be conducted within one year."  *(Id.)*

After the ALJ issued his decision, Plaintiff filed a request for review, specifically challenging the onset date chosen by the ALJ.  *(R. at 12.)*  On March 12, 2004, the Appeals Council issued its decision denying her request and upholding the decision of the ALJ.  *(R. at 4-6.)*  On April 2, 2004, Plaintiff filed her complaint in this action. *(Doc. 1.)*

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *See Hamilton v. Sec'y. of Health & Human Services*, 961 F.2d 1495, 1497-1498 (10th Cir. 1992). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *See, e.g., Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  This Court's assessment is based on a meticulous review of the entire record, where the Court can neither re-weigh the evidence nor substitute its judgment for that of the agency.  *See Hamlin*, 365 F.3d at 1214; *see also Langley*, 373 F.3d at 1118.  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  An ALJ's decision

---

[3]The ALJ also stated that "[f]or the period from January 19, 2001 through March 15, 2003, the claimant retained a residual functional capacity to perform a significant range of sedentary work. She had some non-exertional limitations associated with her chronic back and knee pain and difficulty walking and standing for prolonged periods of time."  *(R. at 19.)*

3

"is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214.

A claimant has the burden of proving his or her disability *(Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)), which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Secretary has established a five-step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137 (1987). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment; he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. §§ 404.1520 and 416.920. *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity (hereinafter "RFC"), age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 446 (10th Cir. 1988).

## III.  Plaintiff's Age, Education, Work Experience and Medical History

At the time of the hearing, Plaintiff was forty-four years old *(R. at 441)* and, therefore, is defined as a "younger person." 20 C.F.R. § 416.963(c). According to the Disability Report, Plaintiff had completed only a GED *(R. at 69)*, but testified during the hearing that she "completed high school and two years." *(R. at 442)*. Plaintiff received specialized training as a nurse's assistant and perhaps

4

the "two years" refers to this training, although it is unclear from the record. *(R. at 442-443.)* During the fifteen year period prior to the ALJ's decision, Plaintiff worked as a certified nurse's assistant and as a maid. *(R. at 64, 72-76.)*

Plaintiff's medical records are extensive and the relevant medical records in the administrative record begin on August 3, 2000, with results from blood tests, a Head CT with contrast, and PA and lateral chest x-rays at Dan C. Trigg Memorial Hospital ordered by C. Chesnut FNP/CNM[4]. *(R. at 108-112.)* The noted clinical indication was "2 weeks of headaches in the frontal area. Blurred vision" *(R. at 111.),* and a productive cough and fatigue *(R. at 112)*. The Head CT was negative *(R. at 111)* and the clinical impression of the x-rays indicated "COPD [chronic obstructive pulmonary disease] with mild interstitial fibrosis," and "[o]steoporosis, scoliosis, and minimal thoracic degenerative disc disease." *(R. at 112.)*

On December 6, 2000, Plaintiff returned to C. Chesnut complaining of back discomfort and a "knot in the right lower back." *(R. at 126.)* Plaintiff indicated she had been painting for several days, up to 10 hours per day, and stretching while on a ladder. *(Id.)* Plaintiff was advised to stop painting, use warm, moist packs on her back, take Advil *(Id.)* and was given a one-week excuse from work. *(R. at 127.)* On December 18, 2000, Plaintiff returned and saw Dr. M. Chesnut for an evaluation of pain in the lumbar and right iliosacral region. *(R. at 125.)* Dr. Chesnut found palpatory tenderness in the lumbar region but noted that Plaintiff "acts like she's having excruciating pain in the right iliosacral region if you even touch that area. I think she's overacting." *(Id.)* Plaintiff was given

---

[4]The Court notes that at Chesnut Family Medicine, P.C., Plaintiff alternatively consults with Myrlen E. Chesnut, D.O. (Doctor of Osteopathy) and Cheryl Chesnut FNP/CNM (Family Nurse Practitioner/Certified Nurse Midwife). *(R. at 117-130, 430-435.)*

right iliosacral and lumbar OMT (Orthopedic Manual Therapy) *(Id.)* and a note excusing her from work until January 2, 2001 *(R. at 124.)*

On January 11, 2001, Plaintiff consulted Dr. M. Chesnut and complained of pain from her back down into the right buttocks area.  *(R. at 123.)*  Dr. Chesnut noted that Plaintiff did not ambulate well, had a limp, and admitted to numbness of the right side of her leg and foot with some tingling and occasional pain.  *(Id.)*  An x-ray indicated some degenerative disk disease between L4 and L5 and L5 and S1.  *(Id.)*  Dr. Chesnut prescribed Darvocet N 100[5] and  suggested Plaintiff have an MRI.  *(Id.)*  The MRI was done on January 13, 2001 and indicated "[m]ild degenerative disc disease at L5-S1 with broad-based disc bulge but no focal disc protrusion."  *(R. at 106.)*  Plaintiff returned to Dr. M. Chesnut on January 17, 2001 to review the MRI results and continued to complain of pain in spite of taking the pain medication. *(R. at 121.)*  Dr. Chesnut prescribed Vicodin[6] and made Plaintiff an appointment with the New Mexico Spine Clinic for further evaluation.  *(Id.)*

The record includes a February 6, 2001 letter/report from Michael E. McCutcheon, M.D.,of the New Mexico Spine Clinic, following an examination and evaluation of Plaintiff. *(R. at 114-115.)*  However, the letter/report appears to be incomplete as it does not contain any conclusions, impressions, nor a signature. *(Id.)*  This letter/report includes only the Plaintiff's self-reported medical history, complaints, and a short description of Dr. McCutcheon's physical examination of Plaintiff. *(Id.)*  The physical examination reveals Plaintiff is "able to walk without an assistive device," but

---

[5]Darvocet N (propoxyphene napsylate with acetaminophen) is a combination of a narcotic (propoxyphene) and a non-narcotic (acetaminophen) that is used to treat mild to moderate pain. *MedicineNet.com.*

[6]Vicodin (hydrocodone/acetaminophen) is a combination of hydrocodone  (a narcotic pain reliever and cough suppressant similar to codeine) and acetaminophen (a non-narcotic analgesic and antipyretic).  *MedicineNet.com.*

"walks with an antalgic gait favoring the right leg and movement is guarded and stiffly performed." *(R. at 115.)*  Dr. McCutcheon also notes "[t]here is 2+ muscle spasm present" and "[p]ain to palpation is present over the lower lumbar and right iliac spine." *(Id.)*

On February 8, 2001, Plaintiff reported to Dr. M. Chesnut that Dr. McCutcheon did not find a reason for a surgical procedure at this point and gave her exercises to "get better." *(R. at 120.)* Dr. Chesnut continued Plaintiff's prescription for Darvoct N 100 , added Parafon Forte[7] to her drug regime and recommended continuation of the exercise program. *(Id.)*  Plaintiff returned to Dr. M. Chesnut on March 13, 2001 for a reevaluation of her back pain and reported the exercises "hurt like crazy." *(R. at 119.)*  Dr. Chesnut noted Plaintiff walked with a limp, had restricted flexion and extension of the lumbar spine. *(Id.)*  He continued her medications and added Celebrex 200[8]. *(Id.)*

On April 13, 2001, Dr. M. Chesnut filled out a Medical Source Statement of Ability To Do Work-Related Activities for Plaintiff and indicated Plaintiff's physical limitations included 1) occasional lifting of 10 pounds and 2) less than 2 hours of standing or walking in an 8-hour day. *(R. at 117-118.)*  Plaintiff had no limitations on sitting, overhead reaching, handling of objects, speaking, hearing, traveling, or fine manipulation. *(Id.)*

Plaintiff returned to Dr. M. Chesnut for a reevaluation of her back pain on April 11, 2001 and reported that with the Celebrex and Parafon Forte her back pain was "quite a bit better." *(R. at 435.)* Dr. Chesnut noted "patient's demeanor has improved considerably over previously." *(Id.)*  On May

---

[7]Parafon Forte (chlorzoxazone) relaxes muscles and relieves pain and discomfort associated with strains, sprains, spasms or other muscle injuries. *MedicineNet.com.*

[8]Celebrex (celecoxib) is a nonsteriodal anti-inflammatory drug (NSAID), specifically a COX-2 inhibitor, which relieves pain and inflammation. It is used to treat arthritis, acute pain, and menstrual pain and discomfort. *MedicineNet.com.*

10, 2001, Plaintiff reported a rash on her back and arms to Dr. M. Chesnut, and stated she felt like the rash was due to the Celebrex. *(R. at 434.)* Dr. Chesnut discontinued the Celebrex, started Plaintiff on Vioxx[9] and continued the Darvocet N and Parafon Forte. *(Id.)* Dr. Chesnut also commented that Plaintiff had been evaluated by the New Mexico Spine Institute and "they have advised that she is not a surgical candidate and feel she will have a spontaneous recovery. She is to be performing back exercises." *(Id.)*

On May 14, 2001, a state agency physician completed a physical residual functional capacity assessment of Plaintiff. *(R. at 131-138.)* The state agency physician found that Plaintiff had 1) exertional limitations including occasional lifting of 20 pounds, frequent lifting of 10 pounds, standing, walking, or sitting about 6 hours in an 8-hour workday, and unlimited ability to push and/or pull; 2) occasional postural limitations regarding climbing, balancing, stooping, kneeling, crouching, and crawling; and 3) no manipulative, visual, communicative, or environmental limitations. *(R. at 132-135.)* The physician noted that "[c]linical findings appear to be compatible with capability for light work." *(R. at 137.)*

On June 22, 2001, Plaintiff returned to Dr. M. Chesnut for evaluation of her back pain and reported that someone was trying to make her go back to work. *(R. at 431.)* Dr. Chesnut noted that Plaintiff "states that her back hurts too bad" to return to work, but "[i]n reviewing the patient's records, it seems there must be some amount of symptom magnification involved." *(Id.)* Plaintiff's

---

[9]Vioxx (rofecoxib) is a nonsteriodal anti-inflammatory drug (NSAID) used to treat pain, particularly the pain of osteoarthritis and menstrual cramps. *MedicineNet.com.*

medications were continued and an appointment made with a physiatrist,[10] Dr. Ogunro.[11]  *(Id.)*  Dr.

Chesnut also stated "I'm not sure in my mind that the patient really needs to be off work anymore but

I did give her a note to stay off until we can get another opinion from Dr. Ogunro."  *(Id.)*  On July

20, 2001 and August 24, 2001, Dr. Chesnut approved refills for Darvocet.  *(R. at 431.)*  Plaintiff

again returned to Dr. M. Chesnut on August 27, 2001 for evaluation of her back pain and reported

that she had seen Dr. Ogunro on July 16th and that he diagnosed her as having fibromyalgia.

*(R. at 430.)*

On May 29, 2002, Don Leon Fong, M.D. performed an orthopedic evaluation of Plaintiff at

the request of Disability Determination Services.[12]  *(R. at 139-140.)*  Dr. Fong relied on information

from Plaintiff's recollections, a physical examination, letters from New Mexico Spine, Dr. Michael

McCutcheon and Clovis Neurology Clinic, Dr. Charles Ogunro.  *(Id.)*  Dr. Fong recommended,

"[b]ased on claimant's history, physical examination and x-ray findings, she can do sedentary work.

Sedentary work is defined as one involving sitting but also involves occasional lifting and/or carrying

articles with a 10# maximum and occasional walking/standing."  *(R. at 140.)*  Dr. Fong also

completed a Medical Source Statement of Ability To Do Work-Related Activities and indicated

Plaintiff was: 1) limited to lifting or carrying 10 pounds occasionally; 2) standing or walking less than

---

[10]A physiatrist is a physician specializing in physical medicine.  Physiatrics is the old term for
physical therapy and now commonly refers to rehabilitation management.  *Stedman's Medical
Dictionary* 1380 (27th ed., Lippincott Williams & Wilkins 2000).

[11]Numerous references are made in the record regarding treatment by Dr. Ogunro, however,
no treatment records from Dr. Ogunro are included in the administrative record.  *(R. at 36, 86, 101,
139, 430, 431, 459.)*

[12]Disability Determination Services is the state agency with which the Social Security
Administration has contracted to develop the medical records in Social Security claims at the initial
and reconsideration levels.  *See* 20 C.F.R. § 404.1519s.

2 hours in an 8-hour day and had limits in overhead reaching and handling of objects; 3) but no limitations on sitting, speaking, hearing or traveling.  *(R. at 141-142.)*

On June 20, 2002, a second state agency physician completed a physical residual capacity assessment of Plaintiff.  *(R. at 145-152.)*   The state agency physician found that Plaintiff had: 1) exertional limitations including occasional lifting of 10 pounds, frequent lifting of 10 pounds; the ability to stand or walk at least 2 hours in an 8-hour workday, the ability to sit about 6 hours in an 8-hour workday and had unlimited ability to push and/or pull; 2) no postural limitations regarding climbing, balancing, stooping, kneeling, crouching, and crawling; and 3) no manipulative, visual, communicative or environmental limitations.  *(R. at 146-149.)*

On July 1, 2002, on a referral from Dr. M. Chesnut, Thomas D. Ramage, M.D. (rheumatologist) conducted a physical examination of Plaintiff.  *(R. at 154-164.)*  Dr. Ramage noted that Plaintiff presented with "a history of fibromyalgia and with the question from Dr. Chesnut of ruling out rheumatoid.  In talking to her, she has pain all over and has trigger points which, by definition, is fibromyalgia.  However it is a diagnosis of exclusion."  *(R. at 154.)*  During the physical examination, Dr. Ramage found multiple trigger points and injected 10 different trigger points.  *(R. at 155.)*  Dr. Ramage found Plaintiff had problems with, *inter alia*, fibromyalgia, fatigue, depression, long-term high-risk medications, osteoarthritis, a history of a lifetime of misfortune, and was anOxyContin[13] user.  *(R. at 155-156.)*  Dr. Ramage put off a diagnosis until all tests were completed

_____

[13]OxyContin (oxycodone) is a narcotic pain reliever and cough suppressant similar to codeine and hydrocodone that is prescribed for the relief of moderate to moderately severe pain. *MedicineNet.com.*

and prescribed trazodone[14] and Paxil[15] for Plaintiff.  *(R. at 156.)*  On August 6, 2002, Plaintiff visited the Partners in Family Wellness Clinic and established herself as a new patient.  *(R. at 171.)*  She told the clinic she had a history of fibromyalgia, osteoporosis, and right leg and back pain.  *(Id.)*  Plaintiff returned to the clinic on August 26, 2002  complaining of right hip pain and radiating pain down the right leg.  *(R. at 170.)*  Plaintiff indicated she was taking trazodone and naprosyn[16] and needed pain medication because her appointment with Dr. Ramage had been canceled.  *(Id.)*

On November 26, 2002, Plaintiff returned to Dr. Ramage and received Depo-Medrol injections for tendinitis in both her shoulders.  *(R. at 153.)*  Dr. Ramage stated Plaintiff had fibromyalgia and osteoarthritis and should continue the Paxil and trazodone.  *(Id.)*  Dr. Ramage noted he did "not think there is any doubt about the disorder, based on her physical findings, lab, and history."  *(Id.)*

On March 31, 2003, Plaintiff went to Presbyterian Healthcare emergency room with abdominal pain and, after a diagnosis of acute cholecystitis (gallstones), requested a referral to the Carlsbad hospital.  *(R. at 393-397.)*  At Carlsbad Medical Center, Plaintiff's condition worsened and she was flown to Covenant Health Systems in Lubbock, Texas on April 1, 2003.  *(R. at 188.)*  Plaintiff remained in the hospital until April 18, 2003 and underwent a laparoscopic cholecystectomy.

---

[14]Trazodone (brand name Desyrel) is an oral antidepressant drug that affects the chemical messengers (neurotransmitters) within the brain that nerves use to communicate with (stimulate) each other.  *MedicineNet.com.*

[15]Paxil (paroxetine) is an antidepressant drug that works by inhibiting the reuptake of serotonin by the nerves that release it, an action which allows more serotonin to be available to be taken up by other nerves.  *MedicineNet.com.*

[16]Naprosyn (naproxen) is a nonsteriodal anti-inflammatory drug (NSAID) used for the treatment of mild to moderate pain, inflammation and fever.  *MedicineNet.com.*

*(R. at 189.)* During her hospitalization, Plaintiff became acutely ill, with the final diagnoses including, *inter alia*, acute and chronic cholecystitis, anemia, thrombocytopenia, escherichia coli sepsis, diarrhea, acute renal failure requiring hemodialysis, encephalopathy, hypothrombinemia, acute respiratory distress syndrome requiring intubation and ventilatory support, multisystem organ failure, streptococcus pneumoniae, leukocytosis, hypotension, and coagulopathy. *(R. at 187, 188-358.)*

On April 28, 2003, Plaintiff checked in with the Partners in Family Wellness Clinic after her hospital discharge. *(R. at 167.)* Plaintiff complained of fatigue, weakness, poor appetite and decreased stamina and endurance. *(Id.)* On May 1, 2003, Plaintiff was hospitalized in Carlsbad Medical Center with a bout of viral gastroenteritis. *(R. at 359.)* Hospitalization was necessary due to her weakened condition following her extended hospitalization in Lubbock. *(Id.)* Plaintiff continued to have renal insufficiency problems but preferred to go home while recovering. *(Id.)* On May 12, 2003, Plaintiff followed up with Partners in Family Wellness and complained of continuing fatigue, weakness, and tiredness. *(R. at 166.)* On May 20, 2003, Plaintiff went to the Kidney & Blood Pressure Clinic of Lubbock for a follow-up consultation on the acute renal failure. *(R. at 392.)* Janet T. Cruz, M.D. noted that Plaintiff was "much improved" and would return in 4 to 6 months if necessary. *(Id.)*

## IV.  Discussion/Analysis

Plaintiff alleges that the ALJ erred at step four of the sequential analysis. Specifically, Plaintiff asserts that: ( 1) the ALJ erred in finding that Plaintiff was not credible as to the extent of her symptoms prior to March 15, 2003; and (2) the ALJ erred in finding that Plaintiff retained the residual functional capacity for a full range of sedentary work prior to March 15, 2003. *(Plaintiff's Memorandum, Doc. 9 at 6, 8.)* Additionally, Plaintiff alleges that the ALJ failed to consider Dr.

Thomas Ramage's diagnosis of fibromyalgia and failed to properly evaluate the effects of Plaintiff's fibromyalgia on her physical limitations prior to March 15, 2003. *(Id. at 6-8.)* Plaintiff asks the Court to reverse the ALJ's partially favorable decision and render a fully favorable decision, or alternatively, remand for a new hearing to establish an earlier onset date. Defendant argues that the ALJ applied the correct legal standards and correctly determined that Plaintiff is not disabled based on substantial evidence.

### A.  Plaintiff's Credibility Prior to March 15, 2003

Plaintiff argues that because the ALJ failed to consider Dr. Thomas Ramage's November 26, 2002 diagnosis of fibromyalgia *(R. at 153)*, and its deleterious effect on her physical abilities, the credibility analysis was flawed. Plaintiff also argues she is entitled to a finding of complete credibility because her complaints of pain and physical limitations were substantiated by objective medical evidence, *i.e.,* Dr. Ramage's examination, tests, and diagnosis. *(Plaintiff's Memorandum, Doc. 9 at 6-7.)*

"Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Sec'y of Health and Human Services*, 898 F.2d 774, 777 (10th Cir. 1990). However, such deference is not absolute. *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993) ("Although this court ordinarily defers to the ALJ as trier of fact on credibility . . . deference is not an absolute rule." [citations omitted]). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

In this case, the ALJ stated that he "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical

evidence," and that he "must also consider any medical opinions, which are statements from acceptable medical sources that reflect judgments about the nature and severity of the impairments and resulting limitations." *(R. at 18.)* The ALJ then listed numerous sources including the orthopedic evaluation (McCutcheon) on February 6, 2001; the Medical Source Statement of Ability to do Work Related Activities of treating physician, Myrlen Chesnut, D.O.; a second orthopedic evaluation (Fong) on May 29, 2002; Plaintiff's daily activities and work attempt; and the opinion of a state agency medical consultant. *(R. at 18-19.)* But the ALJ did not mention the fibromyalgia diagnosis of Dr. Thomas Ramage *(R. at 153, 154-157.)*, nor Plaintiff's extensive medical history documenting her long-term use of pain medications.

The ALJ found that "claimant's testimony and reports of pain and functional restrictions prior to March 15, 2003, are not supported by the evidence to the disabling degree alleged and, therefore, lack credibility." *(R. at 18.)* However, the ALJ provided no indication he considered Dr. Ramage's opinion and fibromyalgia diagnosis. "It is clear that courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling." *Lloyd v. Halter*, 161 F. Supp. 2d 1211, 1218 (D. Kan. 2001); *Ward v. Apfel*, 65 F. Supp. 2d 1208, 1213 (D. Kan. 1999); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). The Court makes no determination of the severity of Plaintiff's fibromyalgia or whether she suffers disabling pain as a result of fibromyalgia, but the ALJ must consider any medical opinions, which are statements from acceptable medical sources, that reflect judgments about the nature and severity of the impairments and resulting limitations. *See* 20 C.F.R. § 416.927; *Social Security Rulings* 96-2p and 96-6p.

Furthermore, the ALJ did not provide any reason for not considering Dr. Ramage's diagnosis. "The [Commissioner] must give substantial weight to the evidence and opinion of the claimant's

treating physician, unless good cause is shown for rejecting it.  If an ALJ rejects the opinion of a treating physician, he or she must articulate specific, legitimate reasons for doing so." *Anderson v. Apfel*, 100 F. Supp. 2d 1278, 1286 (D. Kan. 2000) *quoting Washington v. Shalala,* 37 F.3d 1437, 1440 (10th Cir. 1994) (citation and quotations omitted).  Social Security regulations provide that the length, nature, and extent of the treatment relationship are important factors to consider in determining whether a doctor qualifies as a treating physician.  20 C.F.R. § 416.927(d)(2).  Dr. Ramage's status as a treating physician or a consulting physician is unclear, but the weight given the opinions of either a treating or consulting physician depends on the nature and quality of the relationship with the claimant and should be determined.  20 C.F.R. § 416.927(d).

The Court also notes that there are numerous references to Plaintiff's evaluation and treatment by Dr. Charles Ogunro of the Clovis Neurology Clinic *(R. at 36, 86, 101, 139, 430, 431, 459)*, yet Dr. Ogunro's treatment of Plaintiff is not part of the administrative record. and the ALJ apparently did not request those records.  Plaintiff even testified during the hearing that her fibromyalgia was first diagnosed by Dr. Ogunro *(R. at 459)* (possibly as early as July 16, 2001).  *(R. at 430.)*  At step four, the ALJ's duty is one of inquiry and factual development.  *Henrie v. United States Dep't of Health & Human Serivces*, 13 F.3d 356, 361 (10th Cir. 1993) *quoting Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987).  And because a disability hearing is non-adversarial, an ALJ is obligated to develop the record even where, as here, the claimant is represented by counsel.  *Thompson*, 987 F.2d at 1492.  The ALJ failed to properly develop and assess the record when he failed to consider Dr. Ramage's diagnosis and failed to request Dr. Ogunro's records.

The outcome of this case turns on whether the ALJ finds Plaintiff's testimony and subjective complaints credible.  The fact that Plaintiff was diagnosed with fibromyalgia, which has the potential

to cause disabling pain, could change the ALJ's credibility determination as to Plaintiff's subjective complaints.  Therefore, the Court remands this case for the ALJ to determine Plaintiff's credibility in light of the diagnosis of fibromyalgia.

Because the Court is ordering a remand for further development and evaluation of the record, specifically in regard to Plaintiff's diagnosis of fibromyalgia as a source of objective medical evidence, the Court does not address Plaintiff's claim that the ALJ erred in finding Plaintiff retained the residual functional capacity for a limited range of sedentary work prior to March 15, 2003.  A reevaluation of Plaintiff's credibility and the potential non-exertional limitations resulting from fibromyalgia may impact the finding that she retained the residual functional capacity for a limited range of sedentary work prior to March 15, 2003.

## V.  Conclusion

In conclusion, the Court **FINDS** that the Commissioner's decision is not supported by substantial evidence in the record due to a failure to properly develop and assess the entire record. Accordingly, the Court will **GRANT** *Plaintiff's Motion to Reverse and Remand Administrative Agency Decision* (*Doc. 8*) and **REMAND** this case to the Commissioner.

**WHEREFORE, IT IS HEREBY ORDERED** that the *Plaintiff's Motion to Reverse and Remand Administrative Agency Decision* (*Doc. 8*) is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order, including a rehearing if necessary.  A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes A. Martínez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**